## In re ELECTRIC BOND & SHARE CO.

District Court, S. D. New York.
Dec. 20, 1946.

Harry G. Slater, Chief Counsel, Public Utilities Division, of Philadelphia, Pa. (Jerome M. Alper and Alfred Hill, both of Philadelphia, Pa., of counsel), for Securities and Exchange Commission, petitioner.

Simpson, Thacher & Bartlett, of New York City (John F. MacLane, Richard Jones, and E. N. Asiel, all of New York City, of counsel), for Electric Bond & Share Co.

Charles G. Baker and Franklin S. Wood, both of New York City, for Franklin and Marshall College.

Hawkins, Delafield & Wood, of New York City (Franklin S. Wood and John F. B. Mitchell, Jr., both of New York City, of counsel), for Brundage, Story & Rose.

Samuel Okin, pro se.

LEIBELL, District Judge.

This is a proceeding, under § 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e), in relation to Plan II–A (as amended) of the Electric Bond and Share Company. A preliminary order of this Court, signed by Judge Knox on September 6, 1946, on a supplemental application of the Securities and Exchange Commission, fixed October 11, 1943, at 10:30 A.M., and Room 506, the motion part of this Court, as the time and place for a hearing to determine whether the plan, dated June 24, 1946, and amended September 6, 1946, filed by Electric Bond and Share Company under § 11 (e) of the Public Utility Holding Company Act of 1935 and approved by the Securities and Exchange Commission by its order dated September 6, 1946, "is fair and equitable and appropriate to effectuate the provisions of Section 11 of the Public Utility Holding Company Act of 1935, and whether the Court should enforce and carry out the terms and provisions of said Plan, as amended."

The Court order of September 6th directed that notice of the hearing be given to the holders of record of the company's outstanding preferred and common stock, by mailing them a notice of hearing, together with a copy of the findings and opin-

ion of the Securities and Exchange Commission and the order of said Commission, dated September 6, 1946, and that notice also be given every other person, or his attorney of record, who had entered an appearance at the hearings before the Commission with respect to said plan, and in addition that "notice be given to all other persons by publication" in certain designated newspapers in a form approved by the Court, and that "such notices be mailed and published respectively on or before the 20th day of September, 1946." Proof of the mailing and publication of the notice, pursuant to the order, was submitted at the hearing of October 11, 1946.

The Court order of September 6th also contained a provision that any person who intended to oppose the application of the Commission and the enforcement and carrying out of the terms and provisions of the Plan, should serve, by mail on the Chief Counsel of the Commission and on the attorney for the Electric Bond and Share Company, and file with the Court, "copies of a written statement of objections and any brief proposed to be filed in support thereof," on or before October 4, 1946. The order also provided that "such statement of objections shall be addressed to the Commission's Supplemental Application herein and to the Commission's Findings and Opinion, issued September 5, 1946, referred to above, and shall state in detail, and in the manner required for pleadings by the Rules of Civil Procedure, the extent to which such statement challenges the allegations and findings therein contained, together with any affirmative defense or objections to said Supplemental Application."

The Court order of September 6th also contained a stay and an injunction against any security holder taking any action which would interfere with these proceedings or with the carrying out of this plan or with compliance with the order of the Commission approving the same, including a stay against any suit at law or in equity in any court, commission or tribunal "other than such proceedings before the Commission or this Court or the Circuit Court of Appeals as may be appropriate under the Act or the Rules and Regulations promulgated thereunder, and such review, if any, in the Circuit Court of Appeals as may be provided by law."

Plan II-A as amended provides for the retirement of the outstanding preferred stock of Electric Bond and Share and the disposition of its holdings of stock of American Gas and Electric Company, Pennsylvania Power and Light Company, Carolina Power and Light Company and Birmingham Electric Company.

Electric Bond and Share Company is a corporation organized under the laws of New York. Since 1938 it has been registered as a holding company under the Public Utility Holding Company Act of 1935. Bond and Share owns debt or stock securities, or both, of five direct subsidiary holding companies: American and Foreign Power Company, American Gas and Electric Company, American Power and Light Company, Electric Power and Light Corporation and National Power and Light Company, which in turn own or control 182 utility and nonutility companies; and also itself owns three public utility operating companies, viz., Pennsylvania Power and Light Company, Carolina Power and Light Company and Birmingham Electric Company.

Bond and Share has outstanding capital stock of a total par value of $99,281,388.33, of which $26,251,788.33 is represented by 5,250,357 shares of common stock at $5 par and the balance is represented by preferred stock as follows: 203,012 shares of $5 preferred (now $3.50) at a stated value of $70 totalling $14,210,841; and 840,268 shares of $6 preferred (now $4.20) at a stated value of $70 totalling $58,818,760.[1]

On February 28, 1940, the Securities and Exchange Commission initiated a proceed-

[1] The stated value of this preferred stock became $70 on the consummation of Plan I of the reorganization pursuant to which a $30 per share capital distribution was made to preferred stockholders thereby proportionately reducing the charter liquidation value of this stock as above indicated to $70. The dividend rates on the $70 balance were reduced by 30%; from $6.00 to $4.20 and from $5.00 to $3.50.

ing under § 11 (b) (1) of the Public Utility Holding Company Act, 15 U.S.C.A. § 79k (b) (1),[2] against Electric Bond and Share Company and certain of its holding company subsidiaries, "for the purpose among other things of limiting the operations of each of the registered holding companies in the Electric Bond and Share Company system (other than Foreign Power) to a single integrated public utility system." The Commission's opinion herein states that no hearings have been devoted specifically to consideration of the issues raised in the § 11 (b) (1) proceeding.

Subsequently on May 9, 1940, the Securities and Exchange Commission initiated a proceeding against Electric Bond and Share Company and its subsidiary holding companies under § 11 (b) (2) of the Public Utility Holding Company Act, 15 U.S.C.A. § 79k (b) (2).[3] Hearings were held in that proceeding and the Securities and Exchange Commission issued various orders in connection therewith to effectuate the purposes of the Act. Pursuant to those orders Bond and Share and its subsidiaries have taken steps to accomplish certain aspects of the reorganization and simplification contemplated by the Act. American Gas and Electric Company is in the process of disposing of certain assets pursuant to an order of the Commission. By an order dated August 23, 1941, the Commission, pursuant to § 11 (b) (2) of the Act, directed that National Power and Light Company be dissolved. Pursuant to that order a plan for dissolution was filed with the Commission on October 13, 1941,

and the company is in the process of liquidation and dissolution thereunder. American and Foreign Power Company filed a voluntary plan of reorganization under § 11 (e) of the Act and is presently in the process of reorganization before the Commission. The corporate existence of American Power and Light Company and Electric Power and Light Company was ordered terminated by the Commission on August 22, 1942. These orders were affirmed by the Circuit Court of Appeals, American Power & Light Company v. S. E. C., 1 Cir., 1944, 143 F.2d 250, and also affirmed by the United States Supreme Court, November 25, 1946.

During the period of January 1, 1942, to June 30, 1946, Electric Bond and Share Company declared dividends on its two classes of preferred stock, in an amount which exceeded the company's net income for that period by the sum of $9,520,257. This was a drain on surplus which the Company attempted to remedy by the purchase of its own preferred stock in the open market, with the approval of the Commission, and it thus reduced between September 1941 and June 1945 the stated value of its outstanding preferred stock from $145,565,-500 to $104,328,000. The $30 a share payment under Plan I lowered this total to $73,029,600. The brief submitted herein on behalf of Electric Bond and Share Company states:

"In September, 1944 the Commission indicated in its Findings and Opinion relating to an application by Bond and Share to purchase shares of its preferred stocks on

[2] "It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system * * *."

[3] "It shall be the duty of the Commission * * *:

"(2) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall

take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system."

The constitutionality of this section of the Act was tested by two of Electric Bond and Share Company's subsidiaries, American Power and Light Company and Electric Power and Light Company. The Supreme Court, on November 25, 1946 upheld the constitutionality of the section.

the open market that Bond and Share must proceed with a comprehensive program to retire its preferred stocks (Holding Company Release No. 5271 * * *).

"In the light of the foregoing circumstances, Bond and Share filed with the Commission in July 1945, three plans setting forth its general program of compliance with the Act. The proceedings in connection with such Plans were consolidated by the Commission with the aforesaid Section 11 (b) (1) and 11 (b) (2) proceedings."

These three related plans, designated as Plans I, II and III, sought to effect the elimination of Electric Bond and Share Company's preferred stocks, the settlement of intra-system claims, and the divestment by Bond and Share of its interest in public utility holding companies whose operating subsidiaries are located in the United States, and of its interest in public utility companies which operate in the United States.

Plan I provided for an immediate payment of $30.00 per share on both classes of the preferred stocks of Electric Bond and Share Company, as a partial capital distribution, and for a proportionate modification of the liquidation and redemption rights and dividend rates of this preferred stock, as hereinabove stated. Plan I was approved by the Commission on October 10, 1945, and by an enforcement order of this Court dated November 5, 1945. No objections were made before the Court on the application for enforcement and approval under § 11 (e) of the Act, and no appeal was taken from the enforcement order of November 5, 1945. Plan I was consummated as of November 23, 1945.

Plan II as originally filed July 25, 1945, provided for the completion of the retirement of Bond and Share preferred stock by the distribution to the preferred stockholders of certain stocks owned by Bond and Share together with cash. On June 24, 1946 Bond and Share substituted Plan II–A for Plan II.

Plan II–A was also designed to complete the retirement of Electric Bond and Share Company's preferred stocks by the payment of $70 per share (the modified liquidation value) as a distribution of capital, plus accumulated dividends (at the reduced rate) up to the effective date of the plan, and by the delivery to the preferred stockholder of "an instrument evidencing the fact that in the event the Commission and any appropriate court having jurisdiction should finally approve, or direct, in later proceedings * * * the payment to the holders of such instrument of any additional cash and/or other assets of Bond and Share, the said holders shall have the right to receive such amount, if any."

Plan II–A also provides for the manner in which sufficient funds to accomplish this payment will be made available. It is intended that part of the required funds will be obtained from the proceeds of the sale of Bond and Share's holdings of 846,985 shares of common stock of American Gas and Electric Company and 1,164,373 shares of Pennsylvania Power and Light Company, which will be offered to Bond and Shares' common stockholders for purchase. The offer will be in the form of transferable purchase warrants in the ratio of .16 of a share of American Gas and Electric Company common stock and .20 of a share of Pennsylvania Power and Light Company common stock for each share of Electric Bond and Share Company common stock held. The offer will be at a price $7 less than the closing sale price of American Gas and Electric Company common, and $3.50 less than the closing sale price of Pennsylvania Power and Light Company common on the New York Exchanges, on a trading day to be selected by Electric Bond and Share Company as soon as practicable after final judicial approval of the Plan. This aspect of the plan is subject to two further limitations set forth therein, viz., Electric Bond and Share Company reserves the right to defer the making of the purchase warrant offer "if the market value of securities in general or political, financial, or economic conditions are such as to render it inadvisable to proceed with such offer"; and, such offer shall be effective for a period of only eighteen days and thereafter shall be null and void.[4] Additional

---

[4] In this event Electric Bond and Share Company will sell any remaining shares of American Gas and Electric Company and Pennsylvania Power and

funds will be obtained by the use of such treasury cash of Electric Bond and Share Company as the company may deem it advisable to use in connection with the retirement plan, and also by a loan or loans from banks of such amount "as may be required, when added to the proceeds of the sales of the shares of American Gas and Pennsylvania Power common stocks theretofore consummated and such treasury cash as Bond and Share may deem it advisable to use for the purpose of the Plan, to permit Bond and Share to complete the retirement of all of the outstanding shares of its preferred stocks as provided in the Plan."[5]

Those provisions of the Plan are not, however, absolute. In the event the company is unable to consummate bank loans in an amount sufficient to make payment of the $70 cash per share to the preferred stockholders or "if in the judgment of Bond and Share, conditions render it expedient to make a distribution of capital less than $70.00 per share with respect to its preferred stocks, Bond and Share will make a pro rata distribution of capital with respect to such stocks out of the proceeds of such sales of American Gas and Pennsylvania common stocks as may have been consummated at the time Bond and Share determines to make such a pro rata distribution."

In passing upon the merits of Plan II-A the Securities and Exchange Commission stated: "The question of the claim of the preferred in excess of $100 per share involves complicated questions of law and fact, and under the circumstances, it is appropriate to recognize the possibility of court review of any order issued by us in connection therewith. If the disposition of these securities and the distribution of $70.00 per share are withheld until completion of litigation, the whole Section 11 program of Bond and Share will be delayed." The Commission also pointed out that the plan as filed required the preferred stockholders to rely upon the powers of the Commission under Section 11(b) of the Act to insure the satisfaction of their claims under the instrument to be issued to them after the payment of the $70 capital distribution. The Commission suggested that provisions for the determination and payment of any additional amount in excess of a total of $100 per share to the preferred stockholders could be incorporated within the framework of the plan itself, and at the same time provide for the immediate retirement of the preferred stock by the $70 cash payment, by including in the plan an undertaking by Electric Bond and Share Company to pay within sixty days of the order of the court of final review whatever amounts, if any, may be determined as the balance of the claim of the preferred stockholders. Such amendment of the original plan would provide for (1) the complete retirement of the preferred stock, (2) for a determination of the balance of the preferred stockholders' claim, and (3) preserve the litigation position of all parties with respect to that claim. The enforcement order will state the provisions of the instrument to be delivered to the preferred stockholders under the plan.

Further amendments to the plan were suggested concerning the pro rata payments of the preferred stockholders in lieu of the full payment of $70. These amendments were made. They provided that in the event the company determined to make a pro rata distribution in excess of $55 per share, but less than $70 per share, it would notify the Commission of such intention and would not proceed with such proposal in the event the Commission determines to conduct a hearing thereon. It was further provided by amendment to Plan II-A that in the event only a pro rata distribution was made, the Company would sell the remainder of its holdings of American Gas and Electric Company and Pennsylvania Power and Light Company (including stock as to which warrant rights are not exer-

---

Light Company which are not offered to or not purchased by its common stockholders at prices and terms subject to the approval of the Commission.

[5] The plan provides that in the retirement of the bank loan the proceeds of the sale of any remaining holdings of American Gas and Electric Company and Pennsylvania Power and Light Company and the proceeds of the sale of the common stock of Birmingham Electric Company and Carolina Power and Light Company owned by Electric Bond and Share Company may be used.

cised) at competitive bidding or in such manner as the Commission might direct. Plan II-A as filed did not require notice to the Commission nor did it impose any restrictions on the sale of the American or Pennsylvania stock not taken up by the common stockholders of Electric Bond and Share.

Plan III deals in a general way with the company's proposed divestment of securities in domestic utility companies, and provides "for the sale or other disposal of all securities which Bond and Share owns of public utility holding companies which operate in the United States. Such plan also contemplates the settlement of certain claims against Bond and Share and its wholly owned subsidiaries and former subsidiaries of Bond and Share * * *." Bond and Share would then hold only its stock or other interest in foreign power and light companies. Plan III has not yet been the subject of hearings before the Securities and Exchange Commission and, of course, is not now before this Court.

On June 28, 1946, the Securities and Exchange Commission entered its Notice and Order for a hearing before the Commission on Plan II-A. Such hearings were held on July 24 and August 27, 1946. On September 5, 1946, the Commission filed its Opinion and Findings approving Plan II-A, if the above-mentioned amendments were made. On September 6, 1946, the suggested amendments were filed by Bond and Share and on the same day, pursuant to a request of

Electric Bond and Share Company, the Commission filed in this Court its supplemental application under § 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e)[6] for an order of approval of Plan II-A as amended, and directing that steps be taken to enforce and carry out said plan. It is this application which is presently before the Court.

Before taking up the objections to the plan filed herein by certain stockholders, I shall discuss a motion made in these proceedings by Samuel Okin, the owner of 9,000 shares of common stock. On October 3rd he obtained from Judge Goddard an order to show cause returnable the following day at the motion part of this Court. The motion was adjourned to October 11th and was then referred to me by Judge Caffey who was holding the motion part at that time and who had disqualified himself from sitting as a judge in this Electric Bond and Share proceeding. The Okin motion, based on the order to show cause, was for an order dismissing the application of the Securities and Exchange Commission dated September 6, 1946 which initiated this proceeding, on the ground that the Commission had no authority to file the application and this Court had no jurisdiction to hear the same, because the Commission had failed to permit Mr. Okin to participate in the hearing before the Commission with respect to Plan II-A. Even if the Commission had done the things charged by Mr. Okin, that would not de-

[6] "(e) In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons af-

fected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 79r of this chapter, to enforce and carry out the terms and provisions of such plan. If, upon any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of this section, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; * * *."

prive this Court of jurisdiction over this proceeding, although it might affect the Court's decision to give effect to the plan approved by the Commission.

As alternative relief the movant asked for an order striking this proceeding from the motion calendar of the Court for October 11th and setting the matter down for a hearing on a non-motion day, so that witnesses might be examined and cross-examined concerning the Commission's application to enforce the provisions of Plan II-A, and directing that the Securities and Exchange Commission produce at the said hearing for cross-examination Curtis E. Calder and Lester Ginsburg, chairman of the board of directors and treasurer respectively of Electric Bond and Share, and Edward Hopkinson, Jr., a market expert, all of whom had testified before the Commission in support of Plan II-A. This alternative relief was also denied by the Court for reasons hereinafter stated.

Mr. Okin's motion also sought the following incidental relief: That an order be entered staying the hearing on the Commission's application pending the hearing and determination by the Circuit Court of Appeals, Second Circuit, of certain review proceedings to be instituted by him in said Court [under § 24(a) of the Act, 15 U.S. C.A. § 79x(a)] with respect to the order of the Commission dated September 6, 1946; and that an order be entered staying the hearing in this proceeding pending the hearing and determination by the Commission of a certain plan filed by Samuel Okin with respect to Electric Bond and Share. I denied his application for a stay. Mr. Okin also asked that he be relieved from the necessity of complying with the require-ment that he file his statement of objections by October 4, 1946, and that he be granted an extension of time of at least two weeks for said filing. I granted him an extension until October 16th.

■ Judge Caffey had been assigned to hold the Bankruptcy and Motion Part of this Court for the two weeks of September 30th to October 12th inclusive, according to the schedule entitled "Assignment of United States District Judges, Southern District of New York," on file with the Clerk of this Court. As hereinabove stated he had declared himself disqualified to hear this application of the Commission in this matter, which had been noticed for a hearing in the Motion Part of the Court (Room 506) for October 11th, and he so informed Judge Knox, the Senior District Judge for the Southern District of New York. Judge Knox thereupon assigned me to sit as the judge in this proceeding in accordance with the practice prescribed by Rule 1–b[7] of the General Rules of this District Court; which implements and applies § 23 of the Judicial Code, 28 U.S.C.A. § 27.[8] Mr. Okin's contention that only a Circuit Judge could make the assignment of a District Judge to take Judge Caffey's place in this matter is apparently based upon § 13 or § 20 of the Judicial Code, 28 U.S.C.A. §§ 17 and 24, which do not apply to the situation here presented. The intervention of the senior circuit judge is not necessary in districts having more than one district judge. Benitez v. Bank of Nova Scotia, 1 Cir., 141 F.2d 939 at p. 941.

On October 4th, the return day of the order to show cause obtained by Mr. Okin, the motion based thereon was adjourned to October 11th. On that date there ap-

---

[7] Rule 1–b. "If any judge, by reason of illness, service in another part of the court upon an unfinished case, or other good cause, is unable to do the work allotted to him by any schedule entitled 'Assignment of United States District Judges, Southern District of New York,' and on file in the office of the Clerk of this court, then the work so allotted to such judge, or such part thereof as the senior district judge may deem necessary shall be performed by any other judge who may be assigned or designated to perform such work by the senior district judge."

[8] "§ 27. (Judicial Code, section 23.) Districts with more than one judge; division of business. In districts having more than one district judge, the judges may agree upon the division of business and assignment of cases for trial in said district; but in case they do not so agree, the senior circuit judge of the circuit in which the district lies, shall make all necessary orders for the division of business and the assignment of cases for trial in said district. (Mar. 3, 1911, c. 231, § 23, 36 Stat. 1090.)"

peared upon the motion calendar of this Court the proceeding instituted by the Commission as well as Mr. Okin's motion. Both matters were sent to me for a hearing and determination.

On October 11th the witnesses, whose "cross examination" was sought by Mr. Okin, and who were in Court at the time, were excused by the Court. I thus denied that part of Mr. Okin's application, because I concluded that on the question of whether the plan was fair and equitable and appropriate to effectuate the provisions of § 11, the District Court could not itself add to the record made before the Securities and Exchange Commission. After I had denied Mr. Okin's application for a stay of these hearings pending certain applications that he had made in the Circuit Court of Appeals, that Court denied Mr. Okin's applications for a stay of the § 11(e) hearing in this Court. The plan submitted by Mr. Okin was discussed as an expression of his views in the Commission's supplemental opinion of September 5, 1946, and was rejected by the Commission.

With respect to that part of Mr. Okin's motion which sought a dismissal of this proceeding, I reserved decision and I later received Mr. Okin's testimony in rebuttal to the Commission's contention that the Commission was justified in ruling that it would not hear Mr. Okin orally as an individual, although it would permit him as a stockholder to appear by some other attorney and apply for leave to participate in the hearings before the Commission, and would permit him to remain as a spectator at such hearings as long as he behaved himself, and would receive from him any brief or other communication setting forth his views in respect to the Bond and Share plan.

Any restrictions upon the power of Congress to regulate, through reorganization and dissolution, public utilities engaged in interstate commerce would stem from the Constitution itself since the authority of Congress in that respect is founded in the commerce clause of the Constitution. Art. 1, § 8, cl. 3. American Power & Light Co. v. S.E.C., 329 U.S. 90, 67 S.Ct. 133, 144. One objection to the legality of these proceedings involves § 11(e) of the Act which provides for notice and an opportunity for hearing on any application of a holding company to the Securities and Exchange Commission for the approval of a plan to enable the company to comply with § 11(b). The Fifth Amendment to the Constitution provides in part that no one shall be deprived of his property "without due process of law".

Mr. Okin charges that he was denied the essentials of a fair and proper hearing before the Securities and Exchange Commission and therefore is being deprived of his property without due process of law. The issues presented by this objection are (A) whether a stockholder has an absolute right to examine witnesses and present evidence before the Commission in connection with a plan of reorganization submitted by the corporation pursuant to the provisions of § 11(e) of the Public Utility Holding Company Act of 1935; and (B) whether whatever right of participation the stockholder may have, can be limited or circumscribed by the Commission because of the bad conduct and deportment of the stockholder while participating pro se at previous hearings before the Commission on other phases of the corporation's reorganization.

§ 11(b) (2) which provides for "notice and opportunity for hearing" has been held constitutional though it does not expressly provide for notice and opportunity for hearing to security holders, because it "neither expressly or impliedly authorizes unconstitutional procedure." American Power & Light Co. v. S.E.C., supra. In construing the statute the Supreme Court said:

" * * * the Commission in this instance actually gave all security holders of American and Electric public notice of the pendency of the § 11(b) (2) proceedings and invited them to file applications for intervention before a stated time. This was done pursuant to § 19, which permits the Commission, in accordance with such rules and regulations as it may prescribe, to admit any representative of interested consumers or investors, or any other appropriate person, as a party to any proceeding before that body. These security holders

thus received everything which the Constitution could possibly guarantee them in this respect.

"That the statute does not expressly insist upon what in fact has been given the security holders is without constitutional relevance under these circumstances. Wherever possible, statutes must be interpreted in accordance with constitutional principles. Here, in the absence of definite contrary indications, it is fair to assume that Congress desired that § 11(b) (2) be lawfully executed by giving appropriate notice and opportunity for hearing to all those constitutionally entitled thereto. And when that assumption is added to the provisions of § 19, it becomes quite evident that the Commission is bound under the statute to give notice and opportunity for hearing to consumers, investors and other persons whenever constitutionally necessary. See, The Japanese Immigration Case [Yamataya v. Fisher], 189 U.S. 86, 100, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721.

"But should the Commission neglect to follow the necessary procedure in a particular case, such failure could at most justify an objection to the administrative determination rather than to the statute itself. It would then be needless to do more than nullify the action taken in disregard of the constitutional rights to notice and opportunity for hearing. Since we do not have that situation here, * * *."

█ It is clear from § 19 of the Act, 15 U.S.C.A. § 79s, and Rule 17 of the Commission's Rules[9] that the absolute right to examine and cross examine witnesses is not accorded to every security holder. With 80,000 security holders given notice, not even a tenth of one percent could be accorded that privilege. The hearing should be conducted with the reasonable expedition contemplated by the Act. The Commission by its Rules has set up a procedure for exercising a proper discretion in complying with § 19 of the Act. Mr. Okin was familiar with the section and the rule.

It appears from the testimony taken before me and from the exhibits received in evidence, that Mr. Okin, has participated in several proceedings before the Commission as a limited participant in accordance with Rule 17. Those proceedings involved the Electric Bond and Share Company or its subsidiaries. This limited participation included "leave to call, examine and cross-examine witnesses, to offer documentary evidence, to file briefs and make requests for specific findings and to make oral argument." Pursuing this right of limited participation Mr. Okin, an attorney, acted as his own counsel in the various proceedings. However, the opinions of the Commission and excerpts from the record of its hearings show that on occasions Mr. Okin shouted so loudly as to interfere with other proceedings in an adjoining room; that it became necessary on one occasion to summon the assistance of a police officer to remove him from the hearings; and that on still another occasion he interrupted a hearing upon a matter in which he had no interest to demand certain action of the Commission in his own behalf. His conduct and its effect were summarized by the Commissioners in Matter of National Power and Light Company, 12 S.E.C. 47, Holding Company Act Release No. 4200 (March 27, 1943), as follows:

"It resulted in confusion at the hearings and precipitated rancor, bickering and accusations. He was truculent to all involved, and in spite of admonitions to moderate his tone, repeatedly shouted at the trial examiner and the witnesses. He used badgering tactics in handling witnesses; without cause appearing in the record he accused counsel for the Division of being derelict in his duty; and met unfavorable rulings with repeated accusations of bias. Okin's lengthy irrelevancies and argumentativeness and his penchant for personal excoriation of those who took issue with him have served only to delay, hamper and impede these proceedings, and have caused unwarranted

---

[9] S.E.C. Rule of Practice 17 provides: "(b) Any person may, at the discretion of the hearing officer, be given leave to be heard in any proceeding as to any matter affecting his interests. * * *. (c) Leave to be heard pursuant to paragraph (b) hereof may include leave to call and examine witnesses, to offer documentary evidence, to cross-examine witnesses, to file briefs, to submit proposed findings and conclusions and to make oral argument * * *."

expenditures of time and money. His continued presence at the hearings made orderly procedure impossible * * *."

The Commission then sustained the ruling of the trial examiner excluding Okin from further participation in that hearing.

Thereafter Okin petitioned the Circuit Court of Appeals for the Second Circuit to review the order of the Securities and Exchange Commission. In Okin v. S. E. C., 2 Cir., 1943, 137 F.2d 398, 402, n. 2, the Court affirmed the order of the Commission and in discussing the objector's claim to a right of full participation is said:

"Petitioner claims to be entitled to full participation as of right; but the Act, while requiring the Commission, in accordance with rules it may prescribe, to admit as a party an interested state commission or other state body, states only that it 'may admit as a party' a representative of consumers or security holders or 'any other person whose participation in the proceedings may be in the public interest or for the protection of investors or consumers.' § 19, 15 U.S.C.A. § 79s. The Commission's Rule 17, supra note 1, therefore appears properly applicable in this situation."[10]

The Circuit Court of Appeals determined that Okin, by virtue of the provisions of § 19 of the Public Utility Holding Company Act, did not have an absolute right to be heard and that the privilege of limited participation provided for by the Commission's rule was the measure of his right. However, since he was excluded from the hearing, this limited privilege had been taken from him by such exclusion. Concerning the Commission's action in this respect the Circuit Court of Appeals stated:

"Nor do we think petitioner's final exclusion from the hearing unjustified. Indeed, this termination became inevitable. Petitioner's twenty years of legal practice, to which he made so frequent reference, should have taught him that abuse of the tribunal and of his opponents could not supply a legal deficiency in his case."

After this initial expulsion of the objector from participation in a hearing before the Commission, he was again extended the privilege of limited participation in proceedings involving another Electric Bond and Share subsidiary, American Power and Light Company. Because of a repetition of his objectionable conduct Mr. Okin was excluded from participating by the trial examiner and he was removed from the hearing by a police officer. The trial examiner's action was upheld by the Commission. American Power & Light Co., June 3, 1944, Holding Company Act Release No. 5077. Okin thereupon petitioned the Circuit Court of appeals to stay the orders of the Commission pending a review thereof. The Circuit Court of Appeals held, in Okin v. S. E. C., 2 Cir., 1944, 143 F.2d 960, 961:

"Refusal to overrule the revocation of Okin's limited participation is likewise not reviewable. Whether a person shall be permitted to participate in the proceedings 'in the public interest or for the protection of investors or consumers' is discretionary with the Commission. 15 U.S.C.A. § 79s; Rule XVII(g) of the Commission's Rules; cf. Alston Coal Co. v. Federal Power Commission, 10 Cir., 137 F.2d 740, 742. Refusal of such participation is like an order denying intervention in an action where intervention is not a matter of right. Such an order is not appealable. City of New York v. Consolidated Gas Co., 253 U.S. 219, 40 S.Ct. 511, 64 L.Ed. 870; United States v. California Co-op. Canneries, 279 U.S. 553, 556, 49 S.Ct. 423, 73 L.Ed. 838. Since the challenged orders are not subject to review we have no power to stay them under section 24(b)."

Another incident occurred at which Okin burst noisily into the room in which a hearing in an unrelated matter was being held, demanding that he be heard immediately. Thereafter on September 27, 1944, the Commission issued a memorandum to its trial examiners reciting the past history of Mr. Okin's participation and advising the examiners that the "public interest requires that the privilege of participating in these proceedings be withheld from him." The memorandum also advised that Mr. Okin could apply, in the same manner as other persons, for participation in the proceedings through counsel. On December 12,

---

[10] See footnote 9, supra.

1944, at the opening of the hearings in American Foreign Power Company (File No. 54—111) and Electric Bond and Share Company et al. (File No. 59—12), the trial examiner excluded Okin from the hearings pursuant to the instructions contained in the memorandum of the Commission. His action was upheld in a memorandum opinion of the Commission, in which they declined to enter an order embodying that ruling. American and Foreign Power Company, Holding Company Act Release No. 5500 (Dec. 18, 1944).

■ On July 10, 1946, Okin received notice of the hearing set for July 24, 1946, in the § 11(e) proceeding on Plan II–A and on July 22, 1946 he applied to the Commission for leave to intervene in the proceeding.[11] On July 24, 1946, his application for leave to intervene in the proceedings was denied by the trial examiner. The Commission later issued a memorandum opinion, In the Matter of Electric Bond and Share Company, Holding Company Act Release No. 6835 (August 9, 1946), which upheld the action of the trial examiner and observed that there was no basis for changing the Commission's ruling denying Mr. Okin the right to participate orally in person, that he had been permitted to submit his views in writing if he wished to, and that his right to request leave to participate through counsel had been preserved. Mr. Okin's motion brings this action of the Commission before me for review. The Commission's ruling is also the basis of some of his objections to the findings and order of the Commission approving the plan of reorganization.[12]

■ The reorganization of a public utility holding company and its many subsidiaries is a complex matter and it is essential to effectuate the purposes of the Act that the proceedings be conducted in an orderly manner. The Commission's discretion clearly extends to matters related to this purpose and can be exercised on the grounds that it is necessary to maintain orderliness in the proceedings.

■ The record shows that the objector's conduct had been obstreperous and destructive of orderly procedure in prior proceedings and that his conduct remained unchanged even after the original revocation of his privilege was sustained by the Circuit Court of Appeals. The action of the Commission in refusing him personal oral participation cannot be said to have been arbitrary or unjustified. He was not denied a hearing. The right to present his views was not foreclosed. It was the manner in which those views were to be brought before the Commission that was regulated. He could retain an attorney to represent him who might then apply for leave to participate; he could attend the proceedings as a spectator as long as he behaved himself; and he could submit his views in writing for the consideration of the Commission. "Due process" did not require that the Commission again jeopardize the orderly conduct of its hearings by permitting the personal participation of the objector, Okin.

Mr. Okin's motion and objections, based on the contention that he was not accorded a proper hearing before the Commission, are devoid of merit.

■ The attorneys for Brundage, Story and Rose, investment counsel, were heard on October 11, 1946, amicus curiæ after a determination that they were not parties in interest or representatives of parties in interest and had no standing to object to the plan. Upon resumption of the hearing on October 16, 1946, the same attorneys noted their appearance as counsel on behalf of an objector, Franklin and Marshall College,

---

11 The notice provided: "All persons desiring to be heard or otherwise wishing to participate in the proceedings shall notify the Commission in the manner provided by its rules of practice, Rule 17, on or before the 22nd day of July, 1946."

12 Okin contends that this action by the Commission should have been accompanied by an order so that it would be subject to review by the Circuit Court of Appeals under § 24(a) of the Public Utility Holding Company Act. Okin v. S.E.C., 2 Cir., 143 F.2d 960 is dispositive of this contention. The action of the Commission is interlocutory and not reviewable as a final order. If the action of the Commission in this respect constitutes error it may be reviewed in connection with the final order of approval. See In re United Gas Corporation, D.C., 58 F.Supp. 501.

at the request of its attorney of record. Thereupon the privilege previously extended to them to be heard amicus curiæ was withdrawn. On October 17, 1946, a supplemental statement of objections was filed on behalf of Franklin and Marshall College and a brief in support thereof was received on October 29, 1946. It is urged that Franklin and Marshall College was not given adequate notice or opportunity to be heard at the hearing before the Securities and Exchange Commission. This point was not specified in the statement of objections filed, but it was contended it could be raised under Objection 12 of the Supplemental Statement of Objections filed by this stockholder, which stated that the Plan and the Findings and Opinion of the Commission violate the Fifth Amendment of the U. S. Constitution in that they deprive the preferred stockholders of their property without due process of law and without just compensation. Although that contention seemed rather far fetched, I received testimony and documentary evidence concerning the notice of the Commission's hearing received by both Franklin and Marshall College and the Brundage firm.

Franklin and Marshall College unquestionably received notice of the hearing. The Commission's Notice and Order for Hearing on Plan II-A, dated June 28, 1946, contained the following provision:

"It is further ordered that Bond and Share shall give notice of this hearing to all its security holders (insofar as the identity of such security holders is known or available to it) by mailing to each of said persons a copy of this Notice and Order for Hearing at his last known address at least 14 days prior to the date of this hearing."

There is no denial that the College received the notice. It was sufficient to apprise the stockholder of the hearing. The Commission's opinion shows that its hearing was held pursuant to the notice.

It is contended however that the firm of Brundage, Story and Rose, investment counsel, represented Franklin and Marshall College and that the firm did not receive adequate notice. In support of this contention correspondence between the firm and the Securities and Exchange Commission was offered in evidence. The correspondence contained objections to the plan for the retirement of outstanding preferred stock; a statement that many of the firm's clients had purchased the preferred stock; and a request to be placed on the Commission's mailing list to receive formal notice of public hearings. In the first letter, dated June 25, 1946, the firm advised the Commission:

"At the proper time we will probably wish to be heard in protest against the plan in its present form."

This correspondence does not mention any particular stockholder or group of stockholders, or the objector Franklin and Marshall College. There is nothing in the record to indicate that the Brundage firm was authorized to represent the College or any stockholder in these proceedings; in fact the contrary is true. The members of the firm neither hold nor own any stock in the Electric Bond and Share Company.

Apparently in reply to the letter of June 25, 1946, a special notice was addressed to the Brundage firm by the Commission which they did not receive until July 24, 1946, the date set for the hearing. But it also appears that the Brundage firm was on the regular mailing list of the Commission and that notices had been sent by the Commission to all persons on that mailing list fourteen days before the date scheduled for the hearing. Concerning this, Mr. Warren Clark, a member of the firm, testified that they had received all notices from the Commission regularly and in "all likelihood we received this notice."

It seems clear that both Franklin and Marshall College and the firm of investment counsel of Brundage, Story and Rose received adequate notice of the hearing before the Commission on Plan II-A, pursuant to the Commission's order of June 28, 1946.

At the court hearing the attorneys for the Commission offered as part of the record before the Court a number of volumes containing the testimony and exhibits which were before the Commission as the record on which it based its findings, conclusions and opinion. Two objectants, Samuel Okin

and Franklin and Marshall College, sought to introduce additional evidence on the merits of the plan at the hearing before the Court. I ruled that the Court in an § 11 (e) proceeding could not add to the record made before the Commission on the question of whether the plan was fair and equitable and appropriate to effectuate the provisions of § 11.

If, after notice and opportunity for a hearing, the Commission approves a plan filed by the company under § 11(e) and the company requests the Commission to seek Court approval of the plan and a court order enforcing it, the Commission may apply to the proper United States District Court as defined in § 18(f), 15 U.S.C.A. § 79r(f). But prior to any § 11(e) proceeding the Securities and Exchange Commission, in the performance of the duty imposed on the Commission under § 11(a) of the Act, has itself examined the corporate structure of the holding company and its subsidiary companies, the relationship of the various companies in the holding company system and the properties owned or controlled, to determine whether the system "may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed among the holders of securities thereof, and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public utility system." After completing the study outlined in § 11(a), the Commission upon notice and opportunity for a hearing, may determine under §

11(b) (1) whether the holding company should be ordered to limit the operations of the holding company system to a single integrated public utility system. And if the Commission's study reveals situations that indicate that the continued existence of any company in the corporate structure unnecessarily complicates the structure or unfairly distributes voting power among security holders, the Commission, under § 11 (b) (2), may, after notice and opportunity for hearing, issue an order to correct that condition and may direct that a "holding company shall cease to be a holding company with respect to each of its subsidiary companies which itself has a subsidiary company which is a holding company" (the so-called great-grandfather clause). In respect to the Electric Bond and Share public utility system the Commission made its study under § 11(a) initiated a proceeding under § 11(b) (1), and issued certain orders in an § 11(b) (2) proceeding. Later, in July 1945, the company under § 11(e) itself filed an overall plan, with three subdivisions, Plans I, II and III.

Under the provisions of the Act (§ 24a) the Circuit Court of Appeals may review an order of the Commission and after such review "affirm, modify or set aside such order, in whole or in part." This section specially provides that the Circuit Court of Appeals, on application for leave to adduce additional evidence, may order such additional evidence to be taken before the Commission and to be adduced upon the hearing.[13]

---

[13] Sec. 24. "(a) Any person or party aggrieved by an order issued by the Commission under this title may obtain a review of such order in the circuit court of appeals of the United States within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall be forthwith served upon any member of the Commission, or upon any officer thereof designated by the Commission for that purpose, and thereupon the Commission shall certify and file in the court a transcript of the rec-

ord upon which the order complained of was entered. Upon the filing of such transcript such court shall have exclusive jurisdiction to affirm, modify, or set aside such order, in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do. The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If application is made to the court for leave to adduce additional evidence, and it is shown to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Com-

In re Laclede Gas Light Co., D.C., 57 F. Supp. 997, 1002, considered § 24(a) of the Act in relation to § 11(e) and stated:

" * * * we can see no more reason for permitting evidence to be offered, other than the record made before the Commission in a hearing under Section 11(e) than in a hearing under Section 24(a) of the Act, and especially do we believe this should be the rule when the Court of Appeals may 'modify' or 'set aside' order of the Commission 'in whole or in part' and yet is restricted in the receipt of evidence, solely to send the case back to the Commission to hear such additional evidence. A reasonable interpretation of the Act does not permit a more liberal rule on hearing additional testimony in case before the Court under Section 11(e) than under Section 24(a) of the Act."

██ The province of the District Court in a § 11(e) enforcement proceeding is that of a reviewing authority. Okin v. S. E. C., 2 Cir., 1944, 145 F.2d 206. The court cannot amend or modify the plan and then enter an order of approval since § 11(e) provides that the plan must in the first instance be approved by the Commission. The function of the court is to approve and enforce the plan of reorganization submitted to it, if it finds such plan fair and equitable and appropriate to effectuate the purposes of the Act. To do this the court must examine the plan and the record upon which the Commission's approval of the plan was based. To judge the plan on any other record would run counter to the procedure expressed in the statute.

The reason for this procedure is evident. The method of procedure outlined in the Act " * * * plainly discloses that it was the purpose of Congress to set up a body in the Commission that would be especially trained and versed in matters relating to Public Utilities. These are complex matters calling for the services of experts." In re Laclede Gas Light Co., supra.

██ If upon the judicial hearing under § 11(e) an objectant's counsel makes an application to adduce additional evidence with a specific offer of proof, and if the Court is satisfied that the new evidence is material to the issues heard by the Commission, that reasonable grounds exist for the failure to adduce such evidence at the hearing before the Commission, and that a consideration by the Commission of the proffered evidence would be advisable, it seems to me that the District Court would be justified in referring the matter back to the Commission for a consideration of the proffered evidence. But no such situation is here presented.

██ As to the objectant, Franklin and Marshall College, no reasonable grounds have been shown why the objectant through its attorney did not adduce before the Commission the additional evidence (an expert's testimony) which they wished to offer at the Court hearing. Franklin and Marshall College did not appear before the Commission at the hearing in the § 11(e) proceeding. It could not have been the intention of Congress that an objectant might withhold, until the hearing before the Court in an § 11 (e) proceeding, any offer of evidence material to the issues, when the Commission's Rule 17 would have permitted the objectant to apply to the Commission for participation in the proceeding.

██ The objectant, Samuel Okin, did make application to the Commission for leave to intervene or participate, but the Commission ruled that Mr. Okin would "not be permitted to participate orally in person" but that he would "be permitted to submit

---

mission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which, if supported by substantial evidence, shall be conclusive, and the recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court affirming, modifying, or setting aside, in whole or in part, any such order the Commission shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 239 and 240 of the Judicial Code, as amended [U.S.C., title 28, secs. 346 and 347.]"

444

his views in writing on any pending matter arising in the proceedings" and that "consideration will be given to any request by him to appear through counsel." (See memorandum to Docket Section—July 24, 1946, signed by the Secretary of the Commission.) On July 24, 1946, Mr. Okin appeared before the Trial Examiner and made application for "either intervention or at least participation." To that the Examiner replied:

"Mr. Okin as you have observed, for reasons which you know about, your application for leave to be heard is denied. If you care to engage counsel to represent you, I will entertain an application from such counsel. You may remain as a spectator as long as you conduct yourself as you are doing at the present time."

Mr. Okin excepted to the ruling, but did not engage counsel to make an application for intervention or participation. If he thus lost the opportunity to cross-examine witnesses and to offer evidence through counsel he has only himself to blame.

▆▆▆ In this Court proceeding, the record is bare of any specific offer of proof by Mr. Okin except his request to cross-examine the witnesses who had already testified before the Commission. In his lengthy argument at the hearing before the Court and in his voluminous briefs (almost 300 pages) he did not make any charge of a specific fraud or of personal dishonesty on the part of the management. He charged generally that the plan would "perpetrate a fraud upon the Court" and that "Wall Street" friends of the management would profit from the financial inability of security holders to exercise their right to purchase American Gas and Pennsylvania Power stock under the warrants to be issued to the Bond and Share common stockholders pursuant to the provisions of Plan II–A. Federal Rules of Civil Procedure, rule 9, 28 U.S.C.A. following section 723c, relating to pleading special matters, provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." That requirement is reasonable and has long been recognized both here and in England. General charges of fraud are no substitute for the proof required by the statute.

About 80,000 stockholders own the million shares of preferred stock and the five million shares of common stock of Electric Bond and Share. Only seven of the stockholders filed objections to the plan in the Court proceeding. The objectants were:

(1) Frederick W. McReynolds, of Washington, D. C., owner of 200 shares of the 6% preferred stock of Electric Bond and Share Company;

(2) Barber Securities Corporation, Edward J. Barber, a trustee, and Wheatley Corporation, who joined in one set of objections filed by their attorney, Herman Goldman. The Barber Securities Corporation is the owner of 500 shares of 6% preferred stock acquired prior to the distribution of the $30 a share under Part I of the Plan, and 1300 shares of 6% preferred stock acquired subsequent to the distribution of the $30 a share, and 200 shares of the 5% preferred stock also acquired subsequent to the distribution of the $30 a share. Edward J. Barber, as trustee, is the owner of 500 shares of 6% preferred stock acquired prior to the distribution of $30 a share. The Wheatley Corporation is the owner of 300 shares of 6% preferred stock acquired prior to the distribution of the $30 a share, which it thereafter surrendered in connection with the distribution of $30 a share under Plan I. The Barber Securities Corporation, as to 500 shares of 6% preferred stock refused and did not accede to Part I of the Plan providing for the payment of $30 a share and still holds said shares without any endorsement thereon reflecting the payment of the $30. Edward J. Barber, as trustee, as to the 500 shares of 6% preferred stock likewise did not accede to the Plan for the payment of $30 on account and has not accepted said payment and there is no endorsement on the stock reflecting the distribution of the $30.

(3) R. Hunter Barksdale of Richmond, Virginia, the registered holder of 100 shares of common stock, filed rather informal objections to the plan.

(4) Franklin & Marshall College, the holder of 600 shares of 6% preferred stock, through its attorney, Charles G. Baker, of

Lancaster, Pa., filed formal objections to the plan October 3, 1946, which were later supplemented, with permission of the Court, by a document, prepared by Franklin S. Wood, of counsel for the college and filed October 17, 1946.

(5) Brundage, Story & Rose, a partnership acting as investment counsel, stating that it had clients holding an aggregate of 8,986 shares of the $4.20 preferred stock, 4,225 shares of the $3.50 preferred stock and 15,839 shares of the common stock, filed objections to the Plan on October 4, 1946. The objections frankly stated that the "Objectant has not sought or received power of attorney from any of said clients to appear herein on their behalf but does so in view of their reliance upon Objectant's investment counsel and advice in acquiring or retaining said stocks, and Objectant is advising said clients of the action taken in their behalf by Objectant herein". The Court ruled that on that statement the partnership had no standing in these proceedings.

(6) Samuel Okin, the owner of record of 9,000 shares of common stock, applied to the Court on October 11th for additional time within which to file his statement of objections and in accordance with the leave given he filed a statement of objections on October 16th, 1946.

The objectant, Frederick W. McReynolds, a preferred stockholder, and the objectant, R. Hunter Barksdale, a common stockholder, appeared pro se and filed no brief. Mr. McReynolds did not attend the Court hearing on October 11th. The objections made by Mr. McReynolds are fully covered by the supplemental objections filed on behalf of Franklin & Marshall College. Mr. Barksdale did appear and made a statement on the record in support of the objections which he had filed against Plan II–A. Mr. Barksdale's objections were that the $70 distribution to the preferred stockholders and the sale of Electric Bond and Share's stock interest in American Gas and in Pennsylvania Power would impair the equity of Electric Bond and Share common stock. There is no point to this objection if the sale is made at a proper price. He also objected on the ground that the United States Supreme Court had not handed down any decision in the case of American Power and Light and Electric Power and Light Company, two subsidiaries of Electric Bond and Share, which were to be dissolved by order of the Commission under § 11(b) (1). On November 25th the Supreme Court approved the order of the Commission which directed a dissolution of Electric Power and Light and American Power and Light Company. Mr. Barksdale also objected that according to Plan III (which will be considered by the Commission after Plan II–A) Electric Bond and Share proposes to dispose of all of its domestic subsidiaries and retain only its interest in foreign public utilities through American and Foreign Power Company. In the opinion of the objectant Bond and Share should not do that. Plan III has not yet been passed upon by the Commission and is not now before this Court. As to Plan II–A as amended, the objectant suggests that the preferred stock of Electric Bond and Share be retired with funds to be derived from the sale of debenture bonds. He also objects to the burden which he says will be placed upon common stockholders in asking them to put up money to purchase American Gas and Pennsylvania Power stock. This objection is also made by Mr. Okin and it will be discussed later when I take up Mr. Okin's objections.

Mr. Herman Goldman, who filed objections on behalf of Barber Securities Corporation, did not file any brief in this matter. His representative appeared and stated that he would rely on the objections filed and would make no argument. The objections filed by Attorney Goldman, although recognizing that the necessity exists under the provisions of the Public Utility Holding Company Act of 1935 for the retirement of the preferred stocks, objects to the method of retirement contending that it violates the contract rights of the preferred stock as specified in the charter of the corporation, in that the Plan does not contemplate the payment to the preferred stock of $110 per share, plus the accumulated dividends at the original dividend rates, the redemption price fixed in the charter of Electric Bond and Share. The points covered by the objections advanced by Attorney Goldman are also in-

cluded in the objections filed on behalf of Franklin & Marshall College, which I will now discuss.

The first of the supplemental objections filed on behalf of the College is general in its language and I assume that the specifications in respect thereto are found in the other objections included in the statement.

Objections Nos. 2, 3 and 4 should be read together. They state in effect that Plan II–A violates the charter of Electric Bond and Share which provides that the preferred stock be paid $100 a share "in the event of any liquidation, dissolution or winding up of the affairs of the corporation or any distribution of its capital, whether voluntary or involuntary," and which also provides that the preferred stock "may be called for redemption in whole or in part at any time at One Hundred and Ten Dollars ($110.00)" a share. The objectant argues that under Plan II–A there is no liquidation, distribution of capital or winding up of the corporation in the sense contemplated by the charter and that the $100.00 figure does not apply; further that if the preferred stockholders are not now to be paid $110 a share in accordance with the "redemption" provisions of the charter that then the duty devolves upon the Commission to determine now the fair value of the preferred stock whether above or below $110 a share.

If this plan provided for a liquidation or a distribution of capital to the preferred stockholders in the manner contemplated by the charter, the charter provision of $100 a share would apply. If the plan provided for a redemption of the preferred stock in accordance with the provisions of the charter (which would require the approval of the common stockholders) then the $110 figure would be applicable. But both of these objections lose sight of the fact that Plan II–A and its predecessor, Plan I, provide for the "retirement" of the preferred stock of Electric Bond and Share not in any of the ways specified in the charter, but in accordance with the plans which cut across the charter provisions. The order of the Securities and Exchange Commission dated September 6, 1946, issued in conformity with the Public Utility Holding Company Act is based on the Commission's opinion and specific findings approving Plan II–A as amended and directing that these things be done in the manner specified in the Plan, and not as provided in the charter. It is not necessary that the provisions of the charter of the corporation be followed in a reorganization ordered under § 11. Otis & Co. v. S. E. C., 1945, 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511. Further, the contention that the price to be fixed for the preferred stock should be in excess of $100 per share may be raised later before the Commission and then in this proceeding, when this Court will be called upon to review the Commission's determination of the value to be given to the instrument the preferred stockholders will receive as part of Plan II–A, as amended. The price issue is premature. The Commission has found that the preferred stockholders are entitled to a minimum of $100 per share. Whatever they may be entitled to in excess of $100 will be represented by the instrument they will receive under the Plan.

The liquidation value of $100 and the redemption value of $110 a share are figures which at the proper time the Commission and the Court will have to consider and give weight to in determining what is the equitable equivalent of each share of preferred stock which is being retired under the provisions of the plan. In doing so, the Commission and the Court should comply with the principles enunciated in the opinion of the United States Supreme Court in the case of Otis & Co. v. S. E. C., 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511.

There are two other points that should not be overlooked in passing upon this particular objection that the charter provisions are not being followed in the retirement of the preferred stock in the manner specified in the plan. One point is this—that Plan I was based upon a finding of the Commission that it was necessary that the preferred stock be retired under § 11 of the Act and approving as a first step in the retirement the payment of $30 to each preferred stockholder. The Commission, after approving Plan I, applied to

this Court under § 11(e) for an enforcement order for Plan I and pursuant to the application an order was entered by this Court on November 5, 1945, approving Plan I. No appeal was taken by any stockholder or any other interested party from that order and the time to appeal has long since passed. It would seem that the necessity for the retirement of the preferred stock of Bond and Share has thus been established as the law of this case. But even if the question were still open I would hold that the retirement of the preferred stock could be legally accomplished under the Plan and that it would not be a violation of any constitutional rights of the preferred stockholders. Plans under § 11 have been recognized by the Supreme Court as necessarily cutting across contract or charter rights of the stockholders. In re Securities & Exchange Comm. (Otis & Co., intervener), 3 Cir., 142 F.2d 411, at page 417. That is what the law was intended to accomplish, subject to careful scrutiny by an administrative body, the Securities and Exchange Commission, and by the United States Courts, "thus enabling the assertion and protection of all shareholders' rights." North American Co. v. S. E. C., 1946, 327 U.S. 686, 66 S. Ct. 785, 798, 90 L.Ed. 945. § 11(b) (1) of the Act was held constitutional in North American Co. v. S. E. C., supra, and § 11(b) (2) was held constitutional in American Power & Light Co. v. S. E. C., 329 U.S. 90, 67 S.Ct. 133.

As to whether the preferred stockholders should be paid any sum in addition to the $100, Plan II–A as amended preserves any such right in a formal instrument which will be delivered to each preferred stockholder in addition to the payment he will receive under the Plan.

The procedure for determining the value of the future rights, if any, of the preferred stockholders (in addition to the two payments of $30 and $70) is set forth in an amendment to Plan II–A submitted September 6, 1946, pursuant to the Commission's suggestion. I quote it as follows:

"Procedure relative to determination of further rights, if any, of the preferred stockholders of the Company.

"Within four months after the effective date of this Plan II–A the Company will file with the Commission under Section 11(e) of the Act a further plan specifying the additional amount of cash and/or other assets of the Company, if any, that the Company proposes to pay and/or distribute to its preferred stockholders, which amount (together with the distributions of capital provided in the aforesaid Plan I and this Plan II–A) will constitute the equivalent of all of the rights of such stockholders.

"In the event such further plan is not approved by the Commission and any appropriate Court having jurisdiction, the Company will pay and/or distribute to its preferred stockholders such an amount, if any, of additional cash and/or other assets of the Company as may be finally determined (upon the termination of all appellate processes) by an appropriate Court, acting either in the proceeding under Section 11(e) of the Act involving this Plan II–A or in any proceeding under Section 11(b) or 11(d) of the Act instituted by the Commission, to constitute (when added to the distributions of capital provided in the aforesaid Plan I and this Plan II–A) the equivalent of all of the rights of the preferred stockholders of the Company. Such payment and/or distribution will be made by the Company not later than 60 days after the said final determination of an appropriate Court.

"The Company reserves the right to take any position as a litigant in any of the aforesaid proceedings under Sections 11(e), or 11(d) which it may deem advisable with respect to what additional amount, if any, should be paid and/or distributed to its preferred stockholders and reserves the right to appeal from any orders of the Commission and/or any Court issued in any such proceedings. Anything in this Plan II–A to the contrary notwithstanding, the Company's undertaking hereinabove expressed to the effect that the Company will pay and/or distribute to its preferred stockholders any additional amounts finally determined in the aforesaid Section 11(e) proceeding by an appropriate Court to be due to such stock-

holders shall be wholly null and void and no longer binding on the Company in the event that it is judicially determined that the Company as a result of its aforesaid undertaking has forfeited any of its rights as a litigant or forfeited its right to appeal from any orders of the Commission and/or any Court issued in the foregoing Section 11(e) proceeding."

Objection No. 5 of the Franklin and Marshall College supplemental objections criticizes so much of Plan II–A as would leave until a future date the determination of what the additional payment to the preferred stockholders should be. The objectant asks that the determination of that amount be made at the time Plan II–A is approved. There is no question about the sufficiency of the assets of Electric Bond and Share to pay any amount that may be found due the preferred stockholders under the instrument aforementioned, when that question is determined in a supplemental application under Plan II–A. The plan provides that any sum that may be found due may bear interest, if that is found to be fair, so that the preferred stockholders will not be harmed by the delay in the determination of the value of the instrument they are to receive under the plan. Several of the preferred stockholders have interpreted statement in subsection 6 of Section (a) of the Plan to the effect that "in no event shall any holder of preferred stocks of the Company be entitled to receive any interest on the amount of any claim arising under said Plans I or II–A" as barring the inclusion of any interest in determining the amount to which they may be found to be entitled in addition to the $100. Counsel for the company in its brief states: "The intent of the provisions was to prevent any claim by a preferred stockholder that he is entitled to interest, for instance, on his $70 per share payment if, because of his own neglect, he fails to surrender his stock certificates and receive such payment when it is made available for him at the office of the designated agent or agents of Bond and Share." The statement of the company's counsel should remove any doubt as to the meaning of the interest provision of the Plan. The

instruments will be registered so that their payment may the more easily be made when their value is finally determined.

Objection No. 6 claims that the preferred stockholders should not be required to surrender their certificates and terminate their rights as stockholders, losing their right to vote and to receive dividends, when they are paid the full balance of $70. That provision seems to me to be fair and equitable. Under any charter liquidation they could be required to surrender their preferred stock certificates upon receiving $100 per share therefor and they would of course lose their right to vote as preferred stockholders. To attach a right to vote to the instrument they are to receive under the plan would violate § 11(b) (2) as to an equitable division of voting power.

Supplemental objections 9 and 10 of Franklin & Marshall College state that the retirement now of the preferred stock is discriminatory in favor of the common stockholders, in that the common stockholders will thereafter derive the entire benefits of the continuing enterprises, although the preferred stockholders were given certain prior rights under the company's charter; and that this discrimination is further evidenced by the provisions of the plan which limit "the offer of American Gas & Electric Company and Pennsylvania Power & Light Company common stock exclusively to the Common Stockholders of the Company." If the preferred stockholders receive the equitable equivalent of their rights as preferred stockholders, they have no just cause for complaint about the treatment to be accorded the common stockholders. It is also urged that the sale of the above stocks to the common stockholders in advance of the full payment and retirement of the preferred stock would constitute a distribution of assets to the common stock. The objections overlook the fact that both steps are parts of the same plan and that the proceeds of the sale of the American Gas and Pennsylvania Power stocks will be applied towards the payment in full of the preferred stock. It is admitted by objectant's counsel that the assets of Electric Bond and Share are treble the

amount required to pay the preferred stockholders. The security attaching to the senior position of the preferred stockholders will not be jeopardized by the right given to the common stockholders to purchase, at what may be a discount, American Gas and Pennsylvania Power stock.

The spread provided by the plan (originally $7 on American Gas and $3.50 on Pennsylvania Power) amounted to 16.6% and 15.5%, but in view of the decline on the stock market since September 5th the spread may be greater than that percentage. It is urged that the stocks could be marketed through a public offering at a cost of only 5%. The answer to this objection is that the 5% cost would go to outsiders, the underwriters, whereas the benefits from the spread go to the common stockholders who really own the company when the preferred stock is retired. Another answer is that the Court has the right to rely upon the good judgment of the management in carrying out the plan which is sufficiently flexible so that if the market is not advantageous the stock need not be offered. Under the plan the offering price is keyed to the market and the selection of the date at which the market price will be determined rests with the management. I am not going to assume that the management will dispose of securities for an inadequate consideration, that the directors will deliberately waste the assets. North American Co. v. S. E. C., 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945. If they should do any such thing they would have to answer in damages.

Perhaps, as the objectants urge, it would have been better to provide for a spread in percentages, based upon the market price, instead of a spread in fixed dollar amounts as presently provided in the plan. Nevertheless, the plan as devised is appropriate to effectuate the provisions of § 11(b) and will not work any injustice. If there is any advantage in the dollar arrangement over the percentage arrangement, the benefit will enure to the common stockholders. It will not affect the rights of the preferred stockholders.

Counsel for the objectant, Franklin & Marshall College, argues that Plan II-A is not necessary and appropriate to effectuate the provisions of § 11 in so far as the plan provides for the elimination of the preferred stock. That question was involved in the Plan I proceeding and has been determined. Further this contention does not give due weight to the fact that Bond and Share's stock interest in American Gas and in Pennsylvania Power may not properly be retained by Electric Bond and Share in combination with its other assets under the standards of the statute and the orders of the Commission. Counsel for the College admits that "the elimination of the company's holdings of American and Pennsylvania are accordingly within the direct purview and objective of the Act." The disposition of those two stock holdings of Electric Bond and Share will substantially reduce the earnings of Electric Bond and Share and will render impossible the payment of the dividends on the preferred stock of Electric Bond and Share. The result would be an unsound financial structure for Electric Bond and Share.

One of Mr. Okin's principal objections, an objection that runs throughout his argument and is frequently repeated in his brief, is that he has a better plan than that submitted by the company and approved by the Commission, especially in reference to the disposition of Electric Bond and Share's holdings of American Gas and Pennsylvania Power stock. He asserts that the plan approved by the Commission would result in "dumping" Electric Bond and Share's holdings of American Gas and Pennsylvania Power on the market, to the benefit of Wall Street speculators and to the financial damage of the common stockholders. As the Supreme Court has declared in the North American Company case, the Courts are not to assume that the stock which a holding company owns and is required to dispose of under § 11 will be sacrificed. The reviewing court should assure itself that the plan does set up a method of disposing of the stock interest, without dumping it on the market or wasting its value in any way. Plan II-A as amended, leaves

some discretion with the management to choose the best time for the sale and to key the offering price to a proper market price as of a date selected by the management. That is a prudent provision placing responsibility where it belongs—on the management.

Mr. Okin argues that the common stockholders of Bond and Share will not have the financial means to exercise the rights to purchase the American Gas and Pennsylvania Power stocks and that they will be forced to sell their warrants embodying those rights at a sacrifice to Wall Street speculators. Of course, some of them may prefer to sell their warrants. In support of his argument he refers to a requirement of the Federal Reserve Bank that no loan may be made upon stocks for the purpose of enabling the borrower to purchase additional stock. After Mr. Okin's main briefs were filed in this proceeding, the Federal Reserve Bank amended the rule so that now the stockholders of a holding company who, in a proceeding under § 11, receive certain rights or warrants to purchase stock of a company in the utility system, may borrow on their stock holdings up to 50% thereof in order to exercise the rights thus accorded them. The warrant program is fair and equitable to the common stockholders. In the Commission's supplemental findings and opinion of September 5, 1946, Mr. Okin's plan was discussed as follows:

"Okin's plan provides for the retirement of the preferred stocks by the distribution to preferred stockholders of portfolio securities and cash, the amount and kind of securities and the amount of cash depending upon whether we approve a plan of reorganization for Foreign Power in proceedings pending before us with respect to that company.[21] It will be noted that Okin's program involves delay in the retirement of Bond and Share's preferred stock until final decision has been reached on the Foreign Power reorganization. Although such proceedings are in a relatively advanced stage, considerable time may elapse before final decision thereon is made. In addition, Okin's program involves the necessity of evaluating portfolio securities and determining the full claim of the preferred stocks prior to the taking of any steps toward the retirement of the preferred stock and the disposition of American Gas and Pennsylvania. Plan II–A appears to offer a far more expeditious method of compliance with Section 11(b) not only because it is not dependent upon the decision of a complicated reorganization such as that of Foreign Power, but also because it avoids the lengthy administrative and judicial proceedings necessary in the evaluation of portfolio securities in connection with an exchange plan and in the evaluation of the full claim of the preferred stock. For those and other obvious reasons, Plan II–A is substantially preferable to the proposals advocated by Okin."

The company and the Commission consider the all cash payment to preferred stockholders as the simplest and safest way to retire Electric Bond and Share preferred stock. Although the District Court in passing upon a plan submitted under § 11(e) is required to scrut-

---

[21] "Okin's plan provides that, in the event we finally disapprove the plan for the reorganization of Foreign Power presently pending before us, the preferred stocks of Bond and Share will be retired by the payment to the preferred stockholders of $50 in cash plus ⅔ of a share of the common stock of American Gas for each share of preferred stock held. The cash necessary for this retirement is to be raised by the sale of bonds of Cuban Electric Company, a subsidiary of Foreign Power, held by Bond and Share in the aggregate amount of $19,500,000 the payment by Foreign Power to Bond and Share of $6,000,000 in discharge of its matured notes of like face amount, the sale by Bond and Share of unmatured notes of Foreign Power in the aggregate amount of $24,000,000, and by the use of treasury cash in the amount of $2,664,000. In the event we finally approve the plan for the reorganization of Foreign Power, the plan provides that the preferred stocks will be retired by the distribution of ⅘ of a share of the common stock of American Gas and one share of the common stock of Pennsylvania to the preferred stockholders for each share of preferred stock held."

inize the plan thoroughly to be sure that it meets the standards fixed by § 11, in doing so the Court should attach great weight to the findings and conclusions of the Commission.

In the case of American Power & Light Co. v. S. E. C., 329 U.S. 90, 67 S.Ct. 133, 146, the United States Supreme Court stated:

"It is a fundamental principle, however, that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.' Phelps Dodge Corp. v. Labor Board, supra, 313 U.S. [177, at page] 194, 61 S.Ct. [845], 852, 85 L.Ed. 1271, 133 A.L.R. 1217. In dealing with the complex problem of adjusting holding company systems in accordance with the legislative standards, the Commission here has accumulated experience and knowledge which no court can hope to attain. Its judgment is entitled to the greatest weight, while recognizing that the Commission's discretion must square with its responsibility. Only if the remedy chosen is unwarranted in law or is without justification in fact should a court attempt to intervene in the matter. Neither ground of intervention is present in this instance.

\*        \*        \*        \*        \*

"In view of the rational basis for the Commission's choice, the fact that other solutions might have been selected becomes immaterial. The Commission is the body which has the statutory duty of considering the possible solutions and choosing that which it considers most appropriate to the effectuation of the policies of the Act. Our review is limited solely to testing the propriety of the remedy so chosen from the standpoint of the Constitution and the statute. We would be impinging upon the Commission's rightful discretion were we to consider the various alternatives in the hope of finding one that we consider more appropriate. Since the remedy chosen by the Commission in this instance is legally and factually sustainable, it matters not that American and Electric believe that alternative orders should have been entered."

See, also Commonwealth & Southern Corporation v. S. E. C., 3 Cir., 134 F.2d 747, at page 751, and In re North Continent Utilities Corporation, [a section 11(e) plan], D.C., 54 F.Supp. 527, at page 530.

The Commission's application requests that certain injunctive relief be included in the enforcing order sought in this proceeding. § 11(e) contemplates an effective enforcement order. Legal precedents support the use of injunctive provisions. The pending suits of Mr. Okin in the New York State Supreme Court which run counter to the plan, require some such provisions if the plan is to be carried out in an orderly manner.

The plan submitted under § 11(e) in effect accomplishes a partial reorganization of the corporation. In re Standard Gas & Elec. Co., 3 Cir., 151 F.2d 326. A reorganization to be effective must be protected from attack in other Courts, except on appeal. A final decree in a reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., usually contains provisions restraining creditors or stockholders from interfering with the consummation of the plan of reorganization. Mr. Okin will not be deprived of any constitutional rights in being held to reviewing the Commission's orders by an appeal from this Court's enforcing order to the Circuit Court of Appeals.

I therefore find as a fact that:

(1) Plan II–A as amended is appropriate to effectuate the provisions of § 11 of the Public Utility Holding Company Act of 1935, in respect to Electric Bond and Share Company.

(2) The provisions of Plan II–A as amended are fair and equitable to the preferred and common stockholders of Electric Bond and Share Company, persons affected by the plan. The preferred stockholder is given the equitable equivalent of his rights as a preferred stockholder. The warrant plan is not unfair to the preferred stockholders or to the common stockholders.

As a conclusion of law I hold that Plan II–A as amended should be approved by this Court and an appropriate order entered in conformity with § 11 of the Act to carry

out the provisions of Plan II–A as amended, granting the relief prayed for in the application herein of the Securities and Commission.

Settle an order on two days' notice.